# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

NATIONWIDE PROPERTY & CASUALTY
INSURANCE COMPANY,

      Plaintiff and Counter-Defendant,

v.                                Case No. 15-14491

JAMES BROWN, et al.,

      Defendants and Counter-Plaintiffs.

_____/

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT
## AND TERMINATING MOTION TO DISMISS AS MOOT

This is an insurance dispute. Plaintiff Nationwide Property & Casualty Insurance Company seeks declaratory relief holding that the property insurance policy held by Defendant James Brown is void and does not cover water damage sustained at Defendants James and Tamara Brown's Detroit home.[1] (Dkt. # 19.) Defendants have counterclaimed for breach of contract and seek appointment of an umpire. (Dkt. # 23.)

Before the court are two motions filed by Plaintiff on January 27, 2017: a motion for summary judgment on all claims under Federal Rule of Civil Procedure 56 (Dkt. # 33) and a motion to dismiss under Federal Rule of Civil Procedure 37 (Dkt. # 34), asking the court to dismiss the counterclaims and enter a default judgment against Defendants on the primary claims. The motions are fully briefed and a hearing was held on April 17, 2017. Because the court will grant Plaintiff's motion for summary judgment, it will terminate the Rule 37 motion as moot.

_____

[1] Defendant Tamara Brown is the daughter-in-law of Defendant James Brown. (Dkt. # 33-11, Pg. ID 733.)

# I. BACKGROUND

The following facts are undisputed unless otherwise noted. On November 6,

2013, Defendant James Brown completed and an application for insurance with

Nationwide for the residential property located at 13947 Bramell St., Detroit, Michigan.

(Dkt. # 33-2.) The application contained the following attestation provision:

> I HAVE RECEIEVED AND READ A COPY OF THE "NATIONWIDE
> INSURANCE PRIVACY STATEMENT". [sic] BY SUBMITTING THIS
> APPLICATION, I AM APPLYING FOR ISSUANCE OF A POLICY OF
> INSURANCE AND, AT ITS EXPIRATION, FOR APPROPRIATE
> RENEWAL POLICIES ISSUED BY NATIONWIDE INSURANCE
> COMPANY . . . . I HEREBY DECLARE THAT THE FACTS STATED IN
> THE ABOVE APPLICATION ARE TRUE AND REQUEST THE
> COMPANY TO ISSUE THE INSURANCE AND ANY RENEWALS
> THEREOF IN RELIANCE THEREON.

(Dkt. # 33-2 (emphasis in original).) James signed under this provision. (*Id.*) The same

day, James also completed and signed a Michigan Supplemental Application, which

stated that the supplemental application "becomes a part of the application[.]" (Dkt. #

33-3.) The supplemental application included a similar attestation provision, reading:

> I have read and understand all of the above questions. I confirm that the
> facts stated in this supplemental application are true and request the
> company to issue the Insurance, and any renewals, based on these facts.
> I understand that misrepresentation of information in the supplemental
> application could void some or all of my coverage.

(Dkt. # 33-3, Pg. ID 671.) James signed under this provision as well. (*Id.*)

The supplemental application contained a series of questions about the "covered

residence" and the "insured location," both referring to 13947 Bramell St. The first

question asked, "Do you own the covered residence and is this residence occupied by

you?" In response, James marked "yes." He also marked "yes" in response to question

three, which asked "Have you listed all owners of this property on the application?" To

question six, which asked, "Are the property taxes, for the insured location, delinquent

by two or more years?" James responded "no." Finally, question seven asked, "Are any business operations being conducted from the insured location?" and left a space for the applicant to describe the type of business. James checked "no" and left this space blank. (Dkt. # 33-3, Pg. ID 669.)

## A. The Policy

Based on his application, Nationwide issued James a standard homeowners' insurance policy, Policy No. 91 21 HP 345848, for the property at 13947 Bramell. (Dkt. # 33-4.) The policy period ran from October 30, 2013, to October 30, 2014. (*Id.*)

The policy is amended by a Michigan Amendatory Endorsement (Dkt. # 33-5), which contains a concealment, fraud, or misrepresentation provision. The provision states:

2. Concealment, fraud, or misrepresentation

a) this policy was issued or renewed in reliance with the information you provided at the time of your application for or renewal of this insurance coverage. We may void this policy, deny coverage under this policy, or at our election, assert any other remedy available under applicable law, if you, or any other insured person seeking coverage under this policy, knowingly or unknowingly concealed, misrepresented or omitted any material fact or engaged in fraudulent conduct at the time the application was made or at any time during the policy period.

b) we may void this policy, deny coverage for a loss, or at our election, assert any other remedy available under applicable law, if any insured person or any other person seeking coverage under this policy has knowingly or unknowingly concealed or misrepresented any material fact or engaged in fraudulent conduct in connection with the filing or settlement of any claim.

c) if we void this policy, you must reimburse us if a claim payment was made

d) no person or organization who engaged in fraudulent conduct in connection with the applicable process or filing a claim, or engages in any material misrepresentation regarding the issuance or renewal of this policy shall be entitled to receive any payment under this policy at any time.

(*Id.* at Pg. ID 714 (emphases removed).) The amendatory endorsement also includes a provision requiring that the insured notify Nationwide of changes in circumstances, stating: "**you** have a duty to notify **us** as soon as possible of any change which may affect the premium risk under the policy. This may include, but is not limited to, changes . . . (2) in the occupancy or use of the **residence premises**." (Dkt. # 33-5, Pg. ID 713 (emphases in original).)

The policy contains several coverage exclusions. In particular, the policy contains an exclusion for neglect that bars coverage of losses caused by neglect even if other covered perils also contributed to the loss. The neglect exclusion provides:

> 1. **We** do not cover loss to any property resulting directly or indirectly from any of the following. Such a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss.
> **. . .**
> c. neglect, meaning neglect of the **insured** to use all reasonable means to save and preserve property at the time of and after a loss, or when property is endangered by a covered peril.

(Dkt. # 33-6, Pg. ID 715 (emphases in original).)

The policy also contains conditions precedent to coverage in the form of duties that must be met by the insured after a loss. The relevant section of the policy, as amended by the endorsement, states:

> 3. **Your duties after loss.** In case of loss, **you** must:
>
> a) give immediate notice to **us** or **our** agent. . . .
>
> b) protect the property from further damage. **You** must make repairs required to protect the property and keep a record of repair expenses.
>
> c) as often as **we** reasonably require:
>
> (1) show **us** the damaged property; and
>
> (2) provide records and documents **we** request and permit **us** to make copies.

4

(3) submit to examinations under oath and sign same. At **your** or **our** request, the exams will be conducted separately and not in the presence of any other persons except legal representation.

. . .

e) assist **us** with any claim or suit . . . .

(Dkt. # 33-7, Pg. ID 720; Dkt. # 33-5, Pg. ID 713.) The policy also contains a provision stating "No action can be brought against **us** unless there has been full compliance with the policy provisions. Any action must be started within one year after the date of loss or damage[.]" (DKt. # 33-7, Pg. ID 722.)

Nationwide sent a letter on September 15, 2014, informing James that the policy would not be renewed after it expired on October 30, 2014, because of the deteriorating condition of the residence. (Dkt. # 33-23.) Nationwide sent a second letter on October 7, 2014, stating that the policy would be cancelled for nonpayment of premiums on October 19, 2014. (Dkt. # 33-24.)

## B. The Loss

On October 13, 2014, Tamara contacted Nationwide to report water damage to the house. (Dkt. ## 33-15, 33-37.) She told James Smith, the claims adjuster for Nationwide, that she had returned from a trip around 2:00 a.m. that morning and discovered "water everywhere" that she believed to be coming from the second floor. (*Id.* at Pg. ID 795.) In her subsequent examination under oath ("EUO"), Tamara explained that she and her sons looked around some, but the lights were not working. (Dkt. # 33-17, Pg. ID 874.) She explained that she contacted a friend that knew a plumber and, without shutting off the water, left to spend the rest of the night at her sister's home. (*Id.*) She called Nationwide at around 11:30 that morning, and spoke to Smith. (Dkt. # 33-37.) Smith arrived around 2:30 that afternoon and "found the water

spraying from a supply line for the second-floor bathroom toilet." (Dkt. # 33-37.) Smith closed the stop valve for the toilet and turned off the main water supply valve in the basement to prevent further flooding. (Dkt. # 33-26, Pg. ID 945.)

Nationwide had the loss inspected by a company called "Nederveld." Nederveld's investigators observed after the onsite inspection that the line looked "relatively new" found "physical indentations, deformations of the stainless steel over braided wire, and misshapen areas . . . . consistent with manipulations by tools or instruments unrelated to the installation or use of the equipment." (Dkt. # 33-25, Pg. ID 933.) After further examination, Nederveld found significant deformation suggesting that the damage was caused by "forcible contact" by a tool. (Dkt. # 33-26, Pg. ID 945-46.) Nederveld concluded these deformations were inconsistent with installation or normal operation. (Dkt. ## 33-25, 33-26.)

### C. Statements During Claims Process

Tamara, not James, initially contacted Nationwide about the loss. (Dkt. # 33-37.) Tamara told James Smith, the claims adjuster for Nationwide, that James was staying in Alabama in October and November of 2014. (*Id.*) She also told Smith that James was hospitalized with a stroke, and could not speak. (*Id.*) On November 18, 2014, Nationwide sent a "Notice of Examination Under Oath" pursuant to the policy, stating that James and Tamara would be interviewed on November 25. (Dkt. # 18, 2014.) James did not attend, but Tamara did. At the November 25 EUO, Tamara again claimed that James was in Alabama. (Dkt. # 33-16, Pg. ID 804.)

At a second EUO, on December 29, 2014, Tamara testified that James was not able to care for himself, was sometimes delusional, and that she was in the process of

getting him declared legally incompetent. (Dkt. # 33-17, Pg. ID 832.) She also said that James had returned to Michigan on October 13, 2014, the day she discovered the loss, (*Id.* at Pg. ID 873), contradicting her statement to Smith.

James did not appear for his EUO until July 8, 2015, seven months after the date Nationwide requested in the first notice. (Dkt. # 33-11.) James testified that he had gone to Cleveland and then Tuscaloosa, that the house was in fine condition before he left, and that he was in Tuscaloosa for a week. (*Id.* at Pg. ID 754-55.) He further testified that in the period after the loss—while Tamara was saying that he was in Alabama, had suffered a stroke, and could not speak—he was not in the hospital, had not visited a doctor, and did not know that Tamara had claimed otherwise. (*Id.* at Pg. ID 756.) He also was unaware that Nationwide had been trying to contact him. (*Id.*)

Tamara had attempted to be appointed James's guardian. The probate court appointed a temporary guardian, investigated, and eventually denied the request for a guardianship on June 1, 2015. (Dkt. # 33-18.) As discussed below, Tamara's other statements concerning James's alleged stroke, hospitalization, and extended absence from the state are deemed false.

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine

dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

## III.  DISCUSSION

The court has diversity jurisdiction under 28 U.S.C. § 1332. Federal courts exercising diversity jurisdiction apply the law of the forum state. *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008). Michigan insurance law governs here, as both parties tacitly acknowledge in their briefing.

Under Michigan law, an insurance contract is generally interpreted like any other contract—according to Michigan contract interpretation principles. *Stryker Corp. v. ZL Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012); *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 703 N.W.2d 23, 26 (2005). The policy application, declarations page, amendatory endorsement, and the policy itself constitute the contract. *See Royal Prop. Grp., LLC v.*

*Prime Ins. Syndicate, Inc.*, 267 Mich. App. 708, 715, 706 N.W.2d 426, 432 (Mich. App. 2005) (*citing Hall v. Equitable Life Ass. Soc'y of the U.S.*, 295 Mich. 404, 408, 295 N.W. 204, 206 (1940)). Pursuant to the relevant contract interpretation principles, courts should enforce contract language according to its plain and commonly used meaning, being careful to enforce specific and well-recognized terms. *Henderson v. State Farm*, 460 Mich. 348, 596 N.W.2d 190, 193-94 (1999); *Stryker*, 735 F.3d at 354. A contract should be read as a whole instrument, with the goal of enforcing the intent of the parties. *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1350 (6th Cir. 1996). The meaning of a contract is a question of law. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776, 780 (2003).

Plaintiff's arguments for voiding the policy or denying coverage fall roughly into three categories: alleged misrepresentations in the policy application, failure to immediately act to prevent further damage and notify Plaintiff, and refusal to fully and honestly cooperate with the claims process. The court will find that James misrepresented whether there were any business operations being conducted from the premises and that Tamara's actions during the claims process justify voiding the policy or denying coverage. The court will also address Plaintiff's argument regarding delinquent property taxes. However, the court need not, and will not, discuss Plaintiff's other arguments.

### A.  Misrepresentations in the Application

As amended by the endorsement, the policy states that Plaintiff "may void this policy . . . if you, or any other insured person seeking coverage under this policy, knowingly or unknowingly concealed, misrepresented or omitted any material fact or

engaged in fraudulent conduct at the time the application was made or at any time during the policy period." (Dkt. # 33-5, Pg. ID 714 (emphases removed).) This is consistent with "the well-settled law of [Michigan] that where an insured makes a material misrepresentation in the application for insurance . . ., the insurer is entitled to rescind the policy and declare it void *ab initio.*" *Lake States Ins. Co. v. Wilson*, 231 Mich. App. 327, 331, 586 N.W.2d 113 (Mich. Ct. App. 1998). This is true whether or not the misrepresentation was intentional, so long as the insurer relied on it. *Lash v. Allstate*, 210 Mich. App. 98, 103, 532 N.W.2d 869 (Mich. Ct. App. 1995). "A misrepresentation on an insurance application is material if, given the correct information, the insurer would have rejected the risk or charged an increased premium." *Montgomery v. Fid. & Guar. Life Ins. Co.*, 269 Mich. App. 126, 129, 713 N.W.2d 801 (2005).

Plaintiff points to three alleged misrepresentations in the policy application: first, regarding the status of taxes owed on the property; second, regarding whether any business operations were being conducted from the property; and third, whether James actually owned the property at the time of the application. According to the affidavit of underwriting manager Kim Pesut, attached to Plaintiff's motion, Plaintiff actually relied on each of these representations and would not have issued the policy had it understood these representations to be false. (Dkt. # 33-22.)

Defendants contend that Plaintiff "provides no underwriting manuals, standards or guidelines in response to a specific request." (Dkt. # 38, Pg. ID 1779.) Defendants argue these materials are necessary because misrepresentations in policy applications "must relate to the insurers underwriting guidelines for determining eligibility for coverage." (*Id.* at Pg. ID 1782 (citing *Lake States Ins. Co. v. Wilson*, 231 Mich. App. at

170).) As a result, according to Defendants, the court cannot assess the credibility of Plaintiff's affidavit and Plaintiff "should be precluded from ambushing Defendants with this information at this time." (Dkt. # 38, Pg. ID 1779-80, 1783.)

First, the court notes that the two requests Defendants point to are not, in fact, "specific requests for underwriting manuals, standards or guidelines." Far from "specific," Defendants' first interrogatory asks Plaintiff to list, with respect to "each allegation or statement contained in each numbered paragraph of the pleadings[,]" the "specific facts" relied upon for support, "each person who has knowledge of these facts[,]" and "all documents and tangible things that relate to these facts." (Dkt. # 38-3, PG. ID 1803.) Defendants' first request for production is similarly nonspecific:

> Produce and/or permit for inspection and copying at requesting counsel's office all materials relating to the allegations in your complaint; and the incidents or transactions described in the pleadings of this matter, including photographs known to you or in your possession whether prepared by you or any independent contractor representative of any party and including all documents and pleading that relate to any litigation that refers to the property identified in these pleadings including all documents in Defendant's claims files and underwriting files for all relevant claims including the loss identified in these pleadings . . . .

(Dkt. # 38-3, Pg. ID 1805.) It is not clear to the court that underwriting guidelines fall within either of these requests, and Defendants provide no clarification. Further, Plaintiff avers that it has produced nearly 5,000 bates-numbered pages of discovery in and Defendants have never requested further records or discovery answers. (Dkt. # 39, Pg. ID 1811, n.6.) And, for what it's worth, the affidavit does not reference any underwriting guidelines or manuals. (*See* Dkt. # 33-22.)

Second, Defendants misapprehend the relevant law. *Lake States* provides only that the insurer's guidelines are one possible method for showing reliance upon the misrepresentation. 231 Mich. App. at 170 ("Reliance *may* exist when the

misrepresentation relates to the insurer's guidelines for determining eligibility for coverage.") (emphasis added) (citing *Lash*, 210 Mich. App. at 101).) Courts routinely rely on affidavits attesting to the insurer's reliance on and materiality of statements in insurance applications, including in the *Lake States* decision cited by Defendants. *See* 231 Mich. App. 327 at n.5 ("Lake States submitted an affidavit from its underwriter stating that, pursuant to Lake States' guidelines, had it known of other drivers . . . it would not have issued a policy."); *see also, e.g.*, *Hatcher v. Nationwide Prop & Cas. Ins. Co.*, 34 F. Supp.3d 704, 711 (E.D. Mich. 2014) (Michelson, J.) ("Defendant has provided an unopposed affidavit from its Personal Lines Underwriting Manager stating that '[t]he status of the property taxes is material to Nationwide's decision whether to insure the property' and that "Nationwide would not have issued the policy had it known. . . .'").

Finally, Defendants are not being ambushed with Plaintiff's misrepresentation arguments—all of these issues were raised in the parties' Rule 26(f) discovery plan. (Dkt. # 12, Pg. ID 101.)

The court concludes that the underwriting guidelines are not necessary to establish reliance on or the materiality of the alleged misrepresentations. Plaintiff alleges that James made material misrepresentations with respect to the status of property taxes owed, whether business operations were being conducted from the premises, and whether James actually owned the premises. For the reasons stated below, the court will deny Plaintiff's motion with respect to the taxes, grant it with respect to James's business operations, and decline to address Tamara's businesses and the ownership of the property.

### 1. Allegedly Delinquent Property Taxes

Plaintiff first argues that James made a material misrepresentation on the supplemental application by checking "no" in response to the question, "Are the property taxes, for the insured location, delinquent by two or more years?" (Dkt. # 33-3, Pg. ID 650-53.) Given the affidavit, and that Michigan law bars individuals whose taxes are delinquent for two or more years at the time of issuance or renewal from being "eligible persons" for home insurance, Mich. Comp. Laws § 500.2103(2)(j), the court has no difficulty concluding that whether the taxes were "delinquent by two or more years" is material to the issuance of the policy. *Accord Hatcher*, 34 F. Supp.3d at 711; *see also Carter v. Liberty Ins. Corp.*, 2012 WL 5844653, at *7, (E.D. Mich. Nov. 19, 2012) ("Courts in this District have already determined that misrepresentation to the status of property taxes are material.") (Cox, J.).

Defendants point to Tamara Brown's testimony in her EUO that James Brown was on a payment plan for the property taxes, and aver that "therefore the taxes were not 'delinquent.'" (Dkt. # 38, Pg. ID 1778 (citing Dkt. # 38-1, Pg. ID 1788).) But Tamara stated that she "made payment arrangements and they start on January 14th[,]" referring to January 14, 2015. (Dkt. # 38-1, Pg. ID 1788.) Defendants do not explain how a payment plan beginning in January of 2015 impacts whether James's statement in November of 2013 was a misrepresentation.

In any event, the taxes do not appear to have been "delinquent by two or more years" when James signed the supplemental application on November 11, 2013. (*See* Dkt. # 33-3.) Plaintiff relies heavily on Defendants' admission that they had not paid taxes on the property for 2012 or 2013. What neither party addressed in the briefing,

however, is how property taxes for 2012 could be "delinquent by two or more years" before 2014.

Neither "delinquent" nor "delinquent by two or more years" is defined in the application or elsewhere in the policy. The Sixth Circuit has set out the appropriate method for interpreting undefined terms in Michigan insurance contracts as follows:

> If the insurance policy fails to define a term, the court must interpret it according to its commonly used meaning, taking into account the reasonable expectations of the parties. That is, the policy language in insurance contracts is to be accorded its commonly used meaning unless it is apparent from reading the instrument as a whole that a different or special meaning was intended. A technical construction of policy language which defeats a reasonable expectation of coverage is disfavored.

*Prestige Cas. Co. v. Michigan Mut. Ins. Co.*, 99 F.3d 1340, 1350 (6th Cir. 1996) (internal citations omitted). The application is considered part of the contract. *Royal Prop. Group*, 267 Mich. App. at 715. Nothing on the face of the application, or elsewhere in the policy, suggests a technical or special meaning was intended by either party.

At the motion hearing, Plaintiff argued that "delinquent by two or more years" meant that the taxes assessed in two or more separate tax years had not been paid. In support, Plaintiff repeatedly relied on Judge Michelson's opinion in *Hatcher*. While the court finds Judge Michelson's in-depth treatment of how to interpret the provision helpful, the opinion reaches a quite different interpretation than the one argued by Plaintiff:

> Because the Court finds Nationwide's application (which is part of the overall insurance contract) to be clear and unambiguous,[2] it will interpret "delinquent two or more years" using the common and ordinary meaning of the phrase. "The court may refer to dictionary definitions when

---

[2] Even if "delinquent by two or more years" were ambiguous—meaning susceptible to two or more different reasonable interpretations—the court would be required to strictly construe the language against the insurer and the end result would be the same. *See Henderson*, 460 Mich. at 354

appropriate when ascertaining the precise meaning of a particular term."
*Morinelli v. Provident Life & Accident Ins. Co.,* 242 Mich.App. 255, 262,
617 N.W.2d 777, 781 (2000). Webster's Third New International Dictionary
(1993) defines "delinquent" as "in arrears in payment of debt or interest" or
"past due and unpaid." Black's Law Dictionary (10th ed. 2014) provides, as
one definition of delinquent, "(Of an obligation) past due or unperformed."
Thus, Defendant's application by its plain meaning is asking the
homeowner whether there are property taxes that are past due and that
have been past due for two years or longer from the time of the
application.

*Hatcher*, 34 F. Supp. 3d at 710–11, *aff'd*, 610 Fed. App'x 507 (6th Cir. 2015).

At the hearing, Plaintiff repeatedly argued that the application language should

be interpreted consistently with the Michigan statutory provision excluding persons with

property taxes "delinquent for two or more years" at the time of the application from

eligibility for insurance. *See* Mich. Comp. Laws 500.2103(2)(j). The court again finds

Judge Michelson's opinion in *Hatcher* useful:

First, the Court must interpret the phrase "delinquent two or more years"
according to its commonly used meaning and the expectations of the
parties, not Michigan's General Tax Act, which has no relevance to this
case. Nor does this case involve the construction of the Michigan
Insurance Code, because Nationwide did not rescind the policy based on
Mich. Comp. Laws § 500.2103(2)(j). Rather, as its letter to Plaintiff makes
clear, Nationwide rescinded the policy pursuant to an express policy
provision and Michigan case law that permit rescission based upon a
material misrepresentation by the insured.

Nationwide's application asks, "Are the property taxes for the insured
location delinquent by two or more years?" It may be that Nationwide's
application includes this question because the Michigan Insurance Code
deems ineligible for obtaining homeowner's insurance anyone whose real
property taxes are delinquent for two or more years at the time of
application. But the application does not cite the code or make any other
reference to it. On its face, there is nothing about this application question
that indicates its terms should be defined in accordance with the code,
much less Michigan's General Tax Act. The expectations of the parties
control the interpretation of the contract . . . .

*Hatcher*, 34 F. Supp. 3d at 709–10.

The court agrees with Judge Michelson's reasoning and interpretation. Thus, the question is whether, on November 6, 2013, any property taxes on the insured location had been past due for two years or longer. As the 2012 property taxes did not become due before November 6, 2011, the answer to that question, based on the record, is no. Accordingly, James's statement to that effect on the application was not a misrepresentation.

## 2.  Business Operations on Premises

Plaintiff next argues that James misrepresented whether there were "any business operations being conducted from the insured location." (Dkt. # 33, Pg. ID 653-55.) There are four businesses at issue—one attributed to James and three to Tamara. Because the court will find that James misrepresented whether he was conducting business operations from the house, it will not address Tamara's activities.

First, with respect to James's alleged business, Plaintiff points to articles of incorporation of a Michigan nonprofit called C.O.P.E. (Dkt. # 33-13.) The articles identify the incorporator as a James Brown. (*Id.*) James testified that he did not recall incorporating the organization, but that he worked for C.O.P.E., also called Buffalo Soldiers of Canton, as a youth football coach. (Dkt. # 33-11, Pg. ID 735.) James also testified that he kept football pads, helmets, and other football equipment in the house that he rented or leased to C.O.P.E. (Dkt. # 33-11, Pg. ID 736.) Tamara testified that James owned football equipment and would lease it to the football team. (Dkt. # 33-17, Pg. ID 874-75.) She later clarified that while he leased some equipment, James also donated some as well, particularly jerseys. (*Id.* at Pg. ID 882.)

Tamara testified that the equipment owned by the team was kept in a separate storage unit, and the equipment James leased to the team was kept in the basement. (Dkt. # 33-16, Pg. ID 818.) Pictures of the basement show a large number of jerseys, helmets, shoulder pads, lettermen jackets, umbrellas, socks, sweatshirts, and other equipment and related items. (Dkt. # 33-27.) The "total loss inventory form" shows dozens of jerseys, shirts, football pants, and so on, of all sizes. (Dkt. # 33-14.) Combined, Plaintiff has pointed to evidence in the record showing that James stored equipment in the home that he would lease to the football team for profit.

Defendants aver that "[t]here is [sic] no customers or other business activities at the insured location" beyond James keeping "a few miscellaneous items at the house." (Dkt. # 38, Pg. ID 1779.) Defendants also argue that a policy provision limiting coverage of business property on the residence premises to $500 demonstrates that, within the policy, "there is the contemplation of the existence of business property on the premises." (Dkt. # 38, Pg. ID 1781.)

Defendants' arguments are unpersuasive. First, Plaintiff has pointed to evidence in the record showing far more than "a few miscellaneous items." In fact, James kept dozens to hundreds of items that took up a large portion of the basement and comprised a significant fraction of the total items claimed to be lost. (Dkt. ## 33-27, 33-14.) And, notwithstanding the $500 business property coverage limit, the application asks about "any business operations," not whether more than $500 worth of business property was being stored at the home.

Plaintiff has pointed to undisputed evidence in the record that James was in the business of leasing football equipment to the football team and stored this equipment in

the home when it was not being used. There is no genuine dispute that James was using the basement of the insured property as a warehouse for his equipment leasing business. The court finds that this constitutes conducting "business operations" within the meaning of the application.

As there is no genuine dispute that James was conducting business operations from the insured premises, but had represented to Plaintiff that he was not, James's statement on the application was a misrepresentation. According to the Pesut affidavit, Nationwide would not have issued the policy at this premium had it known about James's business activity. (Dkt. # 33-22.) Therefore, the misrepresentation was material. *Montgomery*, 713 N.W.2d 801. Under the policy terms and well-settled Michigan law, Nationwide "is entitled to rescind the policy and declare it void *ab initio*." *Wilson*, 231 Mich. App. 327, 331. Accordingly, the court finds that Plaintiff is entitled to summary judgment.

Because the court finds that Plaintiff is entitled to summary judgment based on the misrepresentations regarding James's business operations, it will not address Tamara's alleged business operations or the ownership of the property.

## B. False Statements in Claims and Settlement Process

In the original complaint, Plaintiff alleged that "Brown appeared in probate court and was found to be competent, Ms. Brown was not appointed guardian or conservator and the statements made by Ms. Brown as to Brown's alleged stroke, hospitalization, and extended absence from the state were false." (Dkt. # 1, Pg. ID .) In the answer, James—then the only defendant—replied to this allegation by stating, "Plaintiff has been informed that this is true." (Dkt. # 7, Pg. ID 83.) Plaintiff characterizes this

response as "admitting" the allegation, which Defendants do not dispute. Plaintiff asserts the same allegation verbatim in paragraph seventeen of the amended complaint. (Dkt. # 19, Pg. ID 237.) Defendants respond to this allegation by stating "Admit that the probate court conducted an inquiry into the competency of James Brown and denied [sic] to order a guardianship[,]" and do not address the alleged false statements. (Dkt. # 22, Pg. ID 315.) Defendants' brief does not argue that Tamara's statements regarding Mr. Brown's stroke, hospitalization, and extended absence from Michigan were true.

Rule 8(b) requires a defendant responding to a complaint to "admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1)(B). An allegation of the complaint is admitted if "a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6). "A denial must fairly respond to the substance of the allegation." Fed. R Civ. P. 8(b)(2). If a defendant "lacks knowledge or information sufficient to form a belief about the truth of an allegation," the defendant "must so state, and the statement has the effect of a denial." Fed. R. Civ. P. 8(b)(5).

Plaintiff properly alleged that "the statements made by Ms. Brown as to [James] Brown's alleged stroke, hospitalization, and extended absence from the state were false" both in the original complaint and in the amended complaint. (Dkt. # 1; Dkt. # 19, Pg. ID 237.) Defendant was required to either admit or deny the allegations in both answers, and did not do so in either. (Dkt. # 7, Pg. ID 83; Dkt. # 22, Pg. ID 315.) To the extent the record does not already establish the absence of a genuine dispute regarding the veracity of Tamara's statements, the court deems Defendants to have admitted that the statements were false. Fed. R. Civ. P. 8(b)(6).

Thus, Tamara made repeated false claims about James's location and health to the claims adjuster and during her EUO. There is no dispute that Tamara misled Nationwide's agents and concealed James's availability from Nationwide during the claims process and investigation, to the point that James's EUO was delayed by some seven months. Defendants do not argue that Tamara's misrepresentations were true or were made in good faith. Defendants do not provide an affidavit stating that Tamara did not intend to conceal James from Nationwide, or prevent or delay his EUO.

The court finds that Tamara Brown's conduct during the claim and settlement process entitles Plaintiff to summary judgment. The contract contains two relevant provisions. First, the "concealment, fraud, or misrepresentation" provides, in relevant part, that Nationwide "may void this policy [or deny coverage for a loss] . . . if any insured person or any other person seeking coverage under this policy has knowingly or unknowingly concealed or misrepresented any material fact or engaged in fraudulent conduct in connection with the filing or settlement of any claim." (Dkt. # 33-5, Pg. ID 714.) Relatedly, the policy contains conditions precedent to coverage requiring cooperation with the claims process and submission to examinations under oath "as often as [Nationwide] reasonably require[s.]" (Dkt. # 33-5, Pg. ID 713; Dkt. # 33-7.)

Plaintiff contends it may void the policy due to false statements during the claims process regardless of fraudulent intent. (Dkt. # 39, Pg. ID 1813.) In support, Plaintiff quotes *21st Century Premier Ins. Co. v. Zufelt*, stating, "The plain terms of the contract did not require a finding of fraud or intentional misstatement, but rather allowed plaintiff to rescind the contract based on a false statement, misstatement of a material fact, or failure to disclose." 315 Mich. App. 437, 445, 889 N.W.2d 759, 764 (2016). But the

policy in *Zufelt* contained different language, and dealt with misstatements in the application, not the claims process. *See id. Zufelt* does not apply here.

The concealment provision here, with respect to the claims process, provides for denial or rescission when "any insured person or any other person seeking coverage under this policy has knowingly or unknowingly concealed or misrepresented any material fact or engaged in fraudulent conduct in connection with the filing or settlement of any claim." (Dkt. # 33-5, Pg. ID 714.) The plain language of the provision requires concealment or misrepresentation of "any material fact" or "fraudulent conduct" in connection with the filing or settlement of a claim. Thus, fraud and intent are unnecessary, but only if the concealed or misrepresented fact is "material."

Defendants argue that Defendants substantially complied with the coverage conditions, that the misrepresentations were not material, and that whether misrepresentations that are not material were made with fraudulent intent is a question for the jury. (Dkt. # 38, Pg. ID 1782.) The court disagrees on all counts.

First, the misrepresentations were material. Michigan courts have repeatedly emphasized the importance of EUOs to the claims and settlement process, particularly with respect to uncovering fraud. *E.g. Cruz v. State Farm Mut. Auto Ins. Co.*, 466 Mich. 588, 597, 648 N.W.2d 595-96 (2002) (finding that "EUOs in policies have been viewed favorably by courts" due to their ability to discover and eliminate fraudulent claims, the difficulty of which "has been described in scholarly writings in the insurance field as being of 'staggering proportions.'") (citations omitted). Tamara's misrepresentations concealed the location and availability of the actual insured from Nationwide, and impeded its ability to investigate a claim it suspected—with good reason—of being

fraudulent. The court finds that Tamara made repeated, material misrepresentations during the claims process, which justifies denying coverage or voiding the policy under the concealment provision. (Dkt. # 33-5, Pg. ID 714.)

Second, Defendants did not substantially comply with the conditions requiring cooperation with the claims process and submitting to EUOs. Under Michigan law, "willful noncompliance" with an insurer's request for an EUO is not "substantial compliance" with the policy conditions requiring cooperation in the claims process. *See Allen v. Michigan Basic Property Ins. Co.*, 249 Mich. App. 66, 73, 640 N.W.2d 903, 907-08 (2001) (finding insured refusing to submit to EUO based on 5th Amendment right against self-incrimination did not substantially comply with policy conditions)."Willful noncompliance" means "failure or refusal to submit to an [EUO] or otherwise cooperate with an insurer in regard to contractual provisions allowing an insurer to investigate a claim that is part of a *deliberate* effort to withhold material information or a *pattern of noncooperation* with the insurer." *Id.* (quoting *Thomson v. State Farm Ins. Co.*, 232 Mich. App. 38, 45-52, 592 N.W.2d 82 (1998)) (emphases in original). When there has been a failure or refusal to cooperate in the EUO process, [t]he burden henceforth is on the *insured* to demonstrate that the insured has not deliberately withheld material information. This burden will be an extraordinarily difficult one to meet." *Id.* (emphasis in original).

At oral argument, Defendants contended that because both Defendants did—eventually—submit to the EUO, they substantially complied. The court disagrees. While *Allen* and *Thomson* deal with an outright refusal to cooperate, Tamara's repeated false or misleading claims undoubtedly had the same goal. With any investigation, time is

critical. A seven-month delay would cause anyone's interview to be somewhat less useful to an investigator, particularly when cooperation with the investigation is contractually agreed to. Compounded with James's apparent memory problems—and his letter stating that most of his answers "might have been correct or been incorrect," (Dkt. # 34-6), Tamara's concealment effectively deprived Nationwide of the contractually agreed upon EUO of the insured. Thus, Defendants bear the burden of demonstrating that this behavior was not willful, which will be "extraordinarily difficult" to meet. *Allen*, 249 Mich. App. at 73.

Defendants have not pointed to any evidence in the record to show that Tamara's concealment was not deliberate or part of a pattern of noncooperation. Nor can they—Tamara's repeated false statements about James's whereabouts and health demonstrate a pattern of noncooperation on their own. This pattern of noncooperation has continued through the discovery phase of this litigation.[3] The court concludes that Tamara's repeated false statements and both Defendants' pattern of noncooperation, demonstrate "willful noncompliance" with the policy conditions. As a result, the court grants summary judgment on this ground as well.

### C. Waiver and Estoppel

Finally, Defendants argue that because Plaintiff has not returned the premiums paid during the life of the policy, Plaintiff "has waived or should be estopped from relying on the voiding of the policy." (Dkt. # 38, Pg. ID 1783.) Beyond quoting the elements of

---

[3] Though the court declines to address Plaintiff's Rule 37 motion (Dkt. # 34), and would deny it in any event as Defendants complied the with the courts discovery order by producing signed responses to Plaintiff's discovery requests, Defendants' responses were wholly and unmistakably inadequate and Defendants failed to make themselves available for noticed depositions.

equitable estoppel set out in *Conagra, Inc. v. Farmers State Bank*, 237 Mich. App. 109, 141, 602 N.W.2d 390, 405 (1999), [4] Defendants cite no authority for their position that insurers are required to return premiums collected prior to filing declaratory judgment actions. Nor do Defendants actually discuss how the facts here meet the elements of equitable estoppel.

In the Sixth Circuit, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Meridia Prod. Liab. Litig. v. Abbott Laboratories*, 447 F.3d 861, 868 (6th Cir. 2006) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)). Defendants waiver argument is inadequately developed, and is deemed forfeited. In any event, Defendants have not actually addressed any of the elements of equitable estoppel or waiver, and the court concludes that neither doctrine applies.

In summary, the court finds Plaintiff is entitled to summary judgment based on James's material misrepresentations regarding his business operations on the premises as well as Tamara's repeated material misrepresentations during the claims and settlement process. Under the terms of the policy, Plaintiff is entitled to declare the policy void "*ab initio*" due to either of these findings. (Dkt. ## 33-3, 33-5.) The policy also provides that Plaintiff is entitled to reimbursement for the amount already paid on the claim—$41,560.18. (Dkt. # 33-5 ("[I]f we void this policy, you must reimburse us if a

---

[4] "Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." *Conagra*, 237 Mich. App. at 141 (citation omitted).

claim payment was made."); Dkt. # 33-36.) Michigan courts enforce these provisions. *See Wilson*, 231 Mich. App. 327, 331. Accordingly, Plaintiff is entitled to declaratory judgment finding the policy void *ab initio* and is owed repayment of the $41, 560.18 it has paid on the claim, less the amount Defendants paid in premiums during the life of the policy.

Because the court will grant summary judgment to Plaintiff, it will terminate Plaintiff's Rule 37 motion as moot.

It appears to the court that no further issues remain unresolved. Therefore, the court will direct the parties to collaborate and submit a stipulated judgment, agreed upon as to form and reserving all appellate rights. Should the parties be unable to agree on a single version, the parties are directed to prepare competing proposed judgments for the court's review.

## IV. CONCLUSION

IT IS ORDERED that Plaintiff's motion for summary judgment (Dkt. # 33) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion to dismiss (Dkt. # 34) is TERMINATED AS MOOT.

IT IS FURTHER ORDERED that the parties are DIRECTED to confer and submit a stipulated judgment, agreed upon as to form and reserving all appellate rights, in the above-titled matter no later than **May 8, 2017.** Should the parties be unable to agree on a single version, Plaintiff is DIRECTED to submit a proposed judgment no later than

**May 8, 2017**, and Defendant is likewise DIRECTED to submit its own proposed

judgment no later than **May 11, 2017**.

s/Robert H. Cleland       /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  April 24, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, April 24, 2017, by electronic and/or ordinary mail.

s/Lisa Wagner       /
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\15-14491.NATIONWIDE.summary.judgment.dismiss.TLH2.docx